IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REALTIME ADAPTIVE STREAMING LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 17-1519 (VAC) (MPT) |
| v. | ) | |
| | ) | |
| BRIGHTCOVE INC., and BRIGHTCOVE HOLDINGS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANTS BRIGHTCOVE INC.
AND BRIGHTCOVE HOLDINGS, INC.'S MOTION TO DISMISS
<u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com

*Attorneys for Defendants*

OF COUNSEL:

Sonali D. Maitra
Timothy C. Saulsbury
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666

January 26, 2018

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITITES....................................................................................................ii

I.      NATURE AND STAGE OF THE PROCEEDINGS ..........................................................1

II.     SUMMARY OF THE ARGUMENT ................................................................................1

III.    STATEMENT OF FACTS ................................................................................................2

        A.      The Fallon Patents And Realtime's Infringement Allegations ...............................2

        B.      The Non-Fallon Patents And Realtime's Infringement Allegations.......................3

IV.     ARGUMENT ....................................................................................................................4

        A.      Realtime's Claims Fail Under *Twombly* And *Iqbal*...................................................4

                1.      Realtime Fails To State A Claim For The Fallon Patents............................5

                2.      Realtime Fails To State A Claim For The Non-Fallon Patents ...................7

        B.      The Fallon Patents Are Patent-Ineligible Under 35 U.S.C. § 101 .........................9

                1.      The Fallon Patents' Ineligibility Is Ripe For Decision Under Rule
                        12..................................................................................................................9

                2.      The Claims Should Rise Or Fall Together..................................................9

                3.      Abstract Ideas Coupled With Conventional Technology Are Not
                        Patent Eligible............................................................................................10

                4.      Step One:  The Fallon Patents Are Directed To An Abstract Idea ...........11

                5.      Step Two: The Fallon Patents Claim Only Conventional
                        Technology .................................................................................................15

                6.      None Of The Minor Variations On The Abstract Idea Found In
                        Other Claims Alter The Analysis...............................................................18

V.      CONCLUSION................................................................................................................20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013)..............................................................9

*Addiction & Detoxification Inst. L.L.C. v. Carpenter*,
    620 F. App'x 934 (Fed. Cir. 2015) ........................................................4

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ............................................................. *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................1, 4, 8

*Atlas IP, LLC v. Exelon Corp.*,
    189 F. Supp. 3d 768 (N.D. Ill. 2016) .....................................................5

*Atlas IP LLC v. Pac. Gas & Elec.*,
    No. 15-cv-05469-EDL, 2016 WL 1719545 (N.D. Cal. Mar. 9, 2016) ................4, 7

*Bell Atl. Corp v. Twombly*,
    550 U.S. 544 (2007)...................................................................1, 4

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
    681 F.3d 1323 (Fed. Cir. 2012)..............................................................6

*In re Bilski*,
    545 F.3d 943 (Fed. Cir. 2008), *aff'd*, *Bilski v. Kappos*, 561 U.S. 593 (2010) ...........9

*buySAFE, Inc. v. Google, Inc*.,
    765 F.3d 1350 (Fed. Cir. 2014).........................................................9, 18

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
    859 F.3d 1352 (Fed. Cir. 2017)..............................................................10

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343, 1348 (Fed. Cir. 2014)..................................10, 11, 14, 17

*CyberFone Sys., LLC v. Cellco P'ship*,
    885 F. Supp. 2d 710 (D. Del. 2012).......................................................18

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011)..............................................................15

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014)..............................................................11, 13, 14

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)..................................................................15, 16

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017)............................................................................18

*Modern Telecom Sys., LLC v. TCL Corp.*,
    C.A. No. 17-583-LPS-CJB, 2017 WL 6524526 (D. Del. Dec. 21, 2017) ................................5

*Personalized Media Commc'ns, LLC v. Amazon.Com, Inc.*,
    161 F. Supp. 3d 325 (D. Del. 2015), *aff'd sub nom.*, 671 F. App'x 777 (Fed.
    Cir. 2016) ..............................................................................................20

*Raindance Techs., Inc. v. 10x Genomics, Inc.*,
    C.A. No. 15-152-RGA, 2016 WL 927143 (D. Del. Mar. 4, 2016)...........................................4

*Realtime Data, LLC v. Carbonite, Inc.*,
    No. 6:17-cv-00121, 2017 WL 4693969 (E.D. Tex. Sept. 20, 2017)........................................17

*RecogniCorp, LLC v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017).................................................................... *passim*

*SiRF Tech., Inc. v. ITC*,
    601 F.3d 1319 (Fed. Cir. 2010)..............................................................................9

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016)...........................................................................11

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)..........................................................11, 14, 16, 17

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)...........................................................................17

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014)...........................................................................9, 19

**Statutes**

35 U.S.C. § 101 ............................................................................1, 9, 11, 17

**Rules**

Federal Rule of Civil Procedure 12 .............................................................9

## TABLE OF ABBREVIATIONS

| Realtime Adaptive Streaming LLC | "Realtime" or "Plaintiff" |
|---|---|
| Defendants Brightcove Inc. and Brightcove Holdings, Inc. | "Brightcove" or "Defendants" |
| U.S. Patent No. 8,934,535 | the "'535 patent" |
| U.S. Patent No. 9,769,477 | the "'477 patent" |
| U.S. Patent No. 8,929,442 | the "'442 patent" |
| U.S. Patent No. 9,762,907 | the "'907 patent" |
| U.S. Patent No. 7,386,046 | the "'046 patent" |
| the five patents referenced above, collectively | the "Fallon Patents" |
| U.S. Patent No. 8,634,462 | the "'462 patent" |
| U.S. Patent No. 9,578,298 | the "'298 patent" |

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Realtime sued Brightcove on October 26, 2017, alleging infringement of five patents relating to data compression, all of which share a specification and the same inventors (the "Fallon Patents"). Realtime's only basis for infringement is that Brightcove's products are compatible with the H.264 video encoding standard.

On December 1, 2017, Realtime amended its complaint to add two additional patents it had apparently acquired from third parties. Its only basis for infringement of these new patents is that Brightcove's products are compatible with the H.265 standard (the successor to H.264).

Brightcove moves to dismiss all claims, on two separate and independent bases.

## II.     SUMMARY OF THE ARGUMENT

*First*, Realtime fails to plead any facts to support a plausible inference that Brightcove infringes the asserted patents. The Supreme Court's decisions in *Iqbal* and *Twombly* require that a plaintiff plead actual facts to support a plausible inference that the defendant infringes at least one claim of each patent. By alleging only that the accused instrumentalities are compatible with H.264 and H.265, Realtime fails to meet this burden. As described in detail below, simply because a product is compatible with these standards does not mean it infringes. (And in fact, Brightcove categorically does not infringe, and is therefore asking Realtime to drop this suit.)

*Second*, the Fallon Patents are invalid under Section 101 of the Patent Act. Patent law does not protect abstract ideas, even when claimed in a particular context or in connection with conventional technology. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358 (2014). The Fallon Patents violate this principle.  They are directed to no more than the abstract idea of selecting a compression scheme based on a characteristic of data or its communication medium. The patents explain that if, for example, one is faced with limited storage space, one may choose a slower encoder that will result in a higher degree of compression. *See, e.g.*, D.I. 8-1 at 12:1–25.

Humans, using pen and paper, have for centuries used different compression schemes depending on such constraints. Faced with little space within which to enter a date, one might compress January 25, 2018 to "01.25.18." With more space, one might select a compression scheme resulting in "Jan. 25, 2018." The only thing the patents add to this basic, abstract concept is a set of conventional computer implementations. Under *Alice*, this cannot save the claims.

## III.   STATEMENT OF FACTS

### A.   The Fallon Patents And Realtime's Infringement Allegations

All of the Fallon Patents are directed to the concept of selecting a compression scheme based on a characteristic of data or its communication medium. The patents begin by explaining: "The present invention relates . . . in particular, to a system and method for compressing and decompressing data based on an actual or expected throughput (bandwidth) of the system that employs data compression." *See id*. at 1:21–25. The patents go on to explain that there already exist a number of different compression schemes. *Id*. at 1:31–46. Some have high compression ratios, compressing data to a small size, but "take a long time to execute." *Id*. at 1:38–40. Others are faster "but at the possible cost of a lower compression ratio." *Id*. at 1:40–46.

The Fallon Patents claim to "provide dynamic modification of compression system parameters so as to provide an optimal balance between execution speed of the algorithm (compression rate) and the resulting compression ratio." *Id*. at 1:56–60. That means, for example, one might implement "different compression algorithms" based on a situation where "a bottleneck occurs so as to increase the throughput and eliminate the bottleneck." *Id*. at 9:53–59.

The claims of the patent do not claim much more than this basic concept of choosing a compression scheme depending on the data or communications channel. Claim 1 of the '046 patent, as an example, provides:

1. A method comprising:

compressing data using a first compression routine providing a first compression rate, wherein the first compression routine comprises a first compression algorithm;

tracking the throughput of a data processing system to determine if the first compression rate provides a throughput that meets a predetermined throughput threshold, wherein said tracking throughput comprises tracking a number of pending requests for data transmission; and

when the tracked throughput does not meet the predetermined throughput threshold, compressing data using a second compression routine providing a second compression rate that is greater than the first compression rate, to increase the throughput of the data processing system to at least the predetermined throughput level, wherein the second compression routine comprises a second compression algorithm.

D.I. 8-5, Claim 1. The claims are entirely silent as to how this might happen. That is, none of the claims provide a specific compressor—or a variety of compressors—to use based on constraints presented by the data or the communication medium. None of the claims even identify an algorithm to be used in compressing the data. And none specify particular conditions or levels that trigger the use of different compressors—or technology for detecting when those levels have been met.  The only aspects the claims add to the patent's basic concept are conventional computer operations.

With respect to the Fallon Patents, Realtime alleges no more than that Brightcove's products use the H.264 standard, which Realtime contends infringes. *See, e.g.*, D.I. 8 ¶¶ 28–34 (alleging that Brightcove uses H.264 and contending that elements of H.264—rather than any accused *Brightcove* instrumentality—purportedly meet the claim limitations).

### B.   The Non-Fallon Patents And Realtime's Infringement Allegations

The '462 patent recites a "[m]ethod for coding a video signal using hybrid coding." D.I. 8-6 at [57]. The claims require a very specific and detailed series of steps including: (1) the calculation of "quantization efficiency"; (2) setting certain "quantized values" to "all zeroes"; (3) "selecting" which of a "first and second quantization efficiencies is a higher efficiency"; and (4) "selecting" a particular subblock based on the relative "quantization efficiency" of the at least

two subblocks at issue. *Id.* at Claim 1.

The '298 patent is directed to processing of "stereoscopic" video streams—which are streams for displaying three-dimensional video that contain two (i.e., "stereo") images for each frame—one for each eye. *See generally* D.I. 8-7.

With respect to the non-Fallon Patents, Realtime alleges that Brightcove uses the H.265 standard and concludes—without any supporting facts concerning *Brightcove's* accused instrumentalities—that there is infringement of the (fairly detailed) elements of both sets of claims. Incredibly, Realtime relies on *non-essential elements* of the H.265 standard for infringement, thereby providing no possible inference that using the standard means infringing the claims. *See, e.g.*, D.I. 8 ¶¶ 130–139.

## IV.   ARGUMENT

### A.   Realtime's Claims Fail Under *Twombly* And *Iqbal*

A complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007). The plaintiff "must plead enough factual matter that, when taken as true, states a claim to relief that is plausible on its face." *Addiction & Detoxification Inst. L.L.C. v. Carpenter*, 620 F. App'x 934, 936 (Fed. Cir. 2015).[1] "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under this standard, a plaintiff must adequately plead infringement of at least one patent claim. *Atlas IP LLC v. Pac. Gas & Elec.*, No. 15-cv-05469-EDL, 2016 WL 1719545, at *5 (N.D. Cal. Mar. 9, 2016) ("*PGE*"); *Raindance Techs., Inc. v. 10x Genomics, Inc.*, C.A. No. 15-152-RGA, 2016 WL 927143, at *2 (D. Del. Mar. 4, 2016) (finding that complaint failed to state a

---

[1]      Internal quotation marks and alterations omitted, and emphasis supplied, unless otherwise noted.

claim for direct patent infringement after conducting a limitation-by-limitation analysis, comparing the asserted claim to the factual allegations in the complaint); *Modern Telecom Sys., LLC v. TCL Corp.*, C.A. No. 17-583-LPS-CJB, 2017 WL 6524526, at *2 (D. Del. Dec. 21, 2017). "[F]actual allegations that do not permit a court to infer that the accused product infringes each element of at least one claim are not suggestive of infringement—they are merely compatible with infringement." *Atlas IP, LLC v. Exelon Corp.*, 189 F. Supp. 3d 768, 775 (N.D. Ill. 2016). "Because the failure to practice even a single element is all that separates innovation from infringement, there is always an obvious alternative explanation where a plaintiff does not allege facts about each element . . . ." *Id*. Realtime's allegations fail under these principles.

### 1. Realtime Fails To State A Claim For The Fallon Patents

Every claim of the Fallon Patents requires determining a characteristic of data or its communication medium—such as the "throughput" of that medium—and choosing a compression scheme based on that determination. Here is an example from each Fallon Patent:

- Claim 40 of the '046 patent requires tracking "throughput" and providing a "faster rate of compression so as to increase throughput" whenever "throughput falls below a predetermined threshold." D.I. 8-5, Claim 40.
- Claim 1 of the '907 patent requires analyzing "a throughput of a communications channel" to "select two or more different data compression routines." D.I. 8-4, Claim 1.
- Claim 8 of the '442 patent requires selecting a compression scheme "based upon a throughput of a connection channel." D.I. 8-3, Claim 8.
- Claim 1 of the '477 patent requires analyzing the "throughput of a communications channel" and, based on that analysis, selecting an encoder from a plurality of encoders having different compression rates. D.I. 8-2, Claim 1.
- Claim 15 of the '535 patent requires "determining a parameter of . . . a data block" and "selecting one or more asymmetric compressors from among a plurality of compressors based upon the determined parameter or attribute." D.I. 8-1, Claim 15.

Realtime's infringement allegations are that Brightcove uses the H.264 standard, so it necessarily infringes the Fallon Patents; that is, Realtime does not point to the actual operation of any accused Brightcove products to show infringement. Instead, Realtime summarily concludes:

"any H.264-compliant system such as the Accused Instrumentalities would . . . select between at least two asymmetric compressors."  D.I. 8 ¶ 13.

This is wrong. As documented in the H.264 standard cited in the Amended Complaint—the standard does not specify *any* process for compressing data, much less selecting among various compression processes based on data or throughput. Rather, the standard expressly says that it specifies processes for *decoding* a compressed H.264-compliant video and leaves the compression process discretionary. *See* Ex. A[2] (H.264 Standard) at § 3.44 and § 3.49 (stating that the "decoding process" is "specified in this Recommendation," but that the "encoding process" is "not specified in this Recommendation"). Thus, Realtime's allegations fail to support a plausible inference of infringement. *See In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1338 (Fed. Cir. 2012) (holding that infringement allegations failed to state a claim because they were contradicted by materials referenced in the complaint). In other words, pointing to the standard is just not enough.

Moreover, with respect to Claim 15 of the '535 patent's limitation of "determin[ing] a parameter of a data block," Realtime appears to assert that, because the H.264 standard supports a "range" of different "bitrates" (which is the density, in terms of units of data per second, of compressed video) and "resolutions," the standard must necessarily "determine[] a parameter of a data block." *See* D.I. 8 ¶¶ 11–12. But the bitrate and resolution parameters are both attributes of an *already compressed file*. Again, all five Fallon Patents revolve around the concept of analyzing uncompressed data (here, Claim 15's "a portion of a data block")—or a throughput of a communications medium (in other claims)—and choosing a compression algorithm based on that analysis. Thus, even if a product were to permit a user to select the bitrate and resolution of

---

[2]    Exhibits are attached to the Declaration of Timothy C. Saulsbury filed herewith.

the *compressed* bitstream, this cannot support an inference that the product determines any parameter of a *pre-compression* data block, as the "determining" step of Claim 15 requires.

Realtime provides no additional factual allegations for any claim of the remaining Fallon Patents—including, for example, (1) determining throughput (Claims 40 of the '046, 1 of the '907, and 8 of the '442), (2) selecting a compression scheme based on throughput (Claim 8 of the '442), and (3) selecting two or more different data compression routines (Claim 1 of the '907), among many other elements. *See* D.I. 8 ¶¶ 24–99. Instead, it simply recycles the allegations made for Claim 15 of the '535 patent, which themselves are insufficient and say nothing of the additional limitations found in the remaining Fallon Patents. Thus in numerous respects, the allegations for the Fallon Patents do not create a plausible basis for infringement. *See PGE*, 2016 WL 1719545, at *4.

## 2. Realtime Fails To State A Claim For The Non-Fallon Patents

Similar to its allegations with respect to the Fallon Patents, the only factual allegation in support of Realtime's claim of infringement of the non-Fallon Patents is that Brightcove supports the H.265 standard. It does not identify any aspects of *Brightcove's* products that infringe. This fails as both a legal and a logical matter because Realtime identifies portions of H.265 standard that are *non-essential*—meaning that the processes need not be performed in a manner set out in the H.265 specification. Indeed, with respect to the processes that Realtime contends infringe each of the non-Fallon Patents, the H.265 standard itself is *express* that they *need not* be performed in any particular manner.

The '462 patent, for example, claims to be directed to an optimized method of video encoding—called "hybrid" encoding—where one of two alternative predictive encoding solutions may be used. D.I. 8-6, Claim 1. The patent calls for calculating the efficiency of each solution, and then selecting the most efficient one, thereby "always select[ing] the best out of the

two solutions." *Id.* at Claim 1; *id.* at 4:11–63. As is evident from the patent's description of the purported innovation (*see, e.g.*, *id.* 4:11–63) and the language of Claim 1 (the sole claim addressed in the Amended Complaint), Claim 1 is directed to a process for *encoding* a video bitstream—not to any aspect of *decoding* a bitstream. However, in a now-familiar mantra, the H.265 standard is express that "[e]ncoding algorithms" are "*not* specified in this Recommendation." Ex. B (H.265 Spec.) § 0.7. Incredibly, Realtime admits as much, stating that "the coding algorithms tha[t] can be used for reaching specific efficiency targets *are not* specified by the HEVC Spec (as stated in clause 0.7)." D.I. 8 ¶ 112.

Realtime's '298 patent allegations are similarly deficient. The patent is directed to methods for processing "stereoscopic" video streams, i.e., streams for displaying three-dimensional video that contain two ("stereo") images in each frame—one for each eye. *See* D.I. 8-7. Realtime's infringement allegations are premised on the H.265 standard's identification of a type of metadata, called "SEI messages" that can be used to determine how the two constituent images of a stereoscopic frame are "packaged" (e.g., which constitutes the left-hand view and which is the right-hand). *See, e.g.*, D.I. 8 ¶¶ 133–136; Ex. B (H.265 Spec.) at p. 333. But, here too, the H.265 standard is express that "[c]onforming decoders are *not* required to process this information for output order conformance to this Specification" and that "specification for presence of SEI messages are also satisfied when those messages (or some subset of them) are conveyed to decoders (or to the HRD) *by other means not specified in this Specification*." Ex. B at p. 284. Thus, again, alleging that the H.265 standard infringes is just not enough. Even more fundamentally, Realtime pleads no facts supporting a plausible inference that Brightcove processes *any* stereoscopic video streams (let alone in the specific manner claimed by the '298 patent), which alone is fatal to its infringement claim. *Iqbal*, 556 U.S. at

678.

### B.    The Fallon Patents Are Patent-Ineligible Under 35 U.S.C. § 101

Patent law protects only concrete and tangible inventions. It does not protect abstract ideas, even when they are claimed in a particular context or in connection with conventional technology. *Alice*, 134 S. Ct. at 2358. The Fallon Patents violate this principle because all five are directed to the abstract idea of selecting a compression scheme based on a characteristic of data or its communication medium. The challenged claims add nothing to this abstract concept other than a generalized invocation of routine and conventional computer technology and the Internet. The claims are, therefore, invalid as abstract under 35 U.S.C. § 101.

#### 1.    The Fallon Patents' Ineligibility Is Ripe For Decision Under Rule 12

"Whether a claim is drawn to patent-eligible subject matter under § 101 is a threshold inquiry" and "an issue of law." *In re Bilski*, 545 F.3d 943, 950–51 (Fed. Cir. 2008), *aff'd*, *Bilski v. Kappos*, 561 U.S. 593, 602 (2010) (describing § 101 as "a threshold test"); *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1331 (Fed. Cir. 2010) ("Whether a claim is drawn to patent-eligible subject matter is an issue of law . . . ."). For this reason, the Federal Circuit repeatedly has upheld district court decisions finding claims abstract in response to motions brought under Federal Rule of Civil Procedure 12. *See, e.g.*, *buySAFE, Inc. v. Google, Inc*., 765 F.3d 1350, 1352 (Fed. Cir. 2014); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711–12 (Fed. Cir. 2014).

#### 2.    The Claims Should Rise Or Fall Together

The inquiry under § 101 turns on the subject matter of the claims and not on minor variations or the form in which they are written. Thus, the Supreme Court has "long warn[ed] . . . against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art." *Alice*, 134 S. Ct. at 2360; *see also Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1346 (Fed. Cir. 2013) (system claims should rise and fall with method

claims despite their recitation of additional hardware components).

In line with this principle, an applicant may challenge eligibility through representative claims and without engaging in a repetitive attack on each claim individually. For example, in *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, the plaintiff objected that the movant's (and the district court's) failure "to individually address every one of its claims is inconsistent with the statutory presumption of validity." 776 F.3d 1343, 1348 (Fed. Cir. 2014). The Federal Circuit rejected this assertion and instead found that the "district court . . . correctly determined that addressing each claim of the asserted patents was unnecessary" because "all the claims are 'substantially similar and linked to the same abstract idea.'" *Id*.; *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017). All of the claims of the Fallon Patents are substantially similar, addressed to the same abstract idea, and contain (at best) entirely generic computing references. The claims should, therefore, rise or fall together.

### 3. Abstract Ideas Coupled With Conventional Technology Are Not Patent Eligible

In *Alice*, the Supreme Court set forth a two-part framework for analyzing eligibility, namely: (1) determining whether the claims "are directed to [a] patent-ineligible concept[]," and if they are, (2) determining whether the claims contain "additional elements [that] 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355.

Under step one of *Alice*, "[t]he inquiry often is whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017). Put differently, the question in the case of a computer-implemented claim is whether the claim "improves the *functioning of a computer*" or whether it claims an "'abstract idea' for which computers are invoked merely as a tool." *Id*. at 1327. For this reason, the Federal Circuit has

repeatedly found "process[es] that start[] with data, add[] an algorithm, and end[] with a new form of data" ineligible as abstract. *Id.*; *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016); *Content Extraction*, 776 F.3d at 1346. This is because such processes merely invoke computers as a tool to implement the abstract idea, rather than improving the functioning of a computer itself. *RecogniCorp*, 855 F.3d at 1327.

If the claim is directed to an abstract idea, the court proceeds to step two, under which the court must search for an inventive concept: "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to *significantly more* than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355. Importantly, to "save a patent at step two, an inventive concept must be *evident in the claims*." *RecogniCorp*, 855 F.3d at 1327; *Alice*, 134 S. Ct. at 2357 ("[W]e must examine the elements of the claim to determine whether it contains an 'inventive concept.'"); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves."). Moreover, it is well-established that "[s]imply appending conventional steps, specified at a high level of generality" is not "'*enough*' to transform an abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2357, 2360 (emphasis and alteration in original). For that reason, claims directed to abstract ideas implemented using conventional technologies are not patent eligible. *Id.* at 2360; *see also RecogniCorp*, 855 F.3d at 1326 ("'generalized steps to be performed on a computer using conventional computer activity' are abstract"). Thus, that a claim requires "performing generic computer functions such as storing, receiving, and extracting data" cannot confer patent eligibility. *TLI*, 823 F.3d at 612.

### 4.      Step One:  The Fallon Patents Are Directed To An Abstract Idea

All five of the Fallon Patents claim the abstract idea of selecting a compression scheme

based on a characteristic of data or its communication medium. The Fallon Patents do this by first looking at the data or its communications channel. *See, e.g.*, D.I. 8-1 ('535 patent), Claim 15 ("determining a parameter of a least a portion of a data block"); D.I. 8-2 ('477 patent), Claim 1 ("determin[ing] . . . [a] data parameter[] relating to a throughput of a communications channel"). Upon looking at this information, the Fallon Patents choose the compression scheme to apply. *See, e.g.*, D.I. 8-1, Claim 15 ("selecting one or more asymmetric compressors . . . based upon the determined parameter or attribute"). Finally, the Fallon Patents compress the data with the selected compression scheme and, sometimes, store the compressed data. *Id*.

Significantly, none of the Fallon Patents purport to provide a new compression scheme—or even an improvement upon existing compression algorithms. To the contrary, the Fallon Patents acknowledge that data compression—and the concept of *using* compression to reduce the amount of data to transmit—was a well-known, routine and conventional computer technology: "Data compression is *widely used* to reduce the amount of data required to process, transmit, or store a given quantity of information." *See, e.g.*, D.I. 8-1 ('535 patent) at 2:44–46. And, rather than provide a new or improved compression scheme, the patents' shared specification acknowledges that "a variety of data compression algorithms were currently available" and provides "dictionary-based compression," "Lempel-Ziv," "Huffman," lossy, and lossless techniques as examples of some of the well-known algorithms available at the time. *Id*. at 1:31–38; *id*. at 10:1–10.

Nor do the claims provide any particularized technological means for selecting from among the available compression schemes. Instead, they are broadly directed to the mere *idea* of selecting a compression scheme based on some undefined aspect of the data or its communication channel. But that is no more inventive than a handyman's selection of a

screwdriver or a box wrench depending on the fastener to be tightened—or a plumber's selection

of a drain-clearer appropriately sized for the diameter of a pipe.

The Federal Circuit's recent decision in *RecogniCorp* confirms that the Fallon Patents are

abstract. Just like the Fallon Patents, the claims in *RecogniCorp* were drawn to the compression

of digital data. 855 F.3d at 1327. Specifically, the *RecogniCorp* claims were directed to

addressing difficulties involved in the "[d]igital transmission" of images. *Id*. at 1324. The claims

sought to address this problem by compressing the images prior to transmission, using a coding

algorithm that "required less memory and bandwidth" than the original image format, and "at the

other end decoding the images." *Id*. Unlike the Fallon Patents, which do not purport to provide

any new or particularized compression schemes, the *RecogniCorp* claims provided an algorithm

for deriving the encoded image data from a source image. *See id*. Notwithstanding that the

claims provided a particular means for compressing the data—using "at least one multiplication

operation on a facial code using one or more code factors as input parameters"—the Federal

Circuit found the patent directed to the abstract concept of "standard encoding and decoding":

> This method *reflects standard encoding and decoding, an abstract concept long
> utilized to transmit information. Cf. Intellectual Ventures I LLC v. Capital One
> Fin. Corp.*, 850 F.3d 1332, 1340–41 (Fed. Cir. 2017) (organizing, displaying, and
> manipulating data encoded for human- and machine-readability is directed to an
> abstract concept). *Morse code, ordering food at a fast food restaurant via a
> numbering system, and Paul Revere's "one if by land, two if by sea" signaling
> system all exemplify encoding at one end and decoding at the other end.*

*RecogniCorp*, 855 F.3d at 1326. Analogizing the claims to those at issue in its prior decision in

*Digitech*, the Federal Circuit explained that "[a] process that start[s] with data, add[s] an

algorithm, and end[] with a new form of data [i]s directed to an abstract idea." *Id.* at 1327.

Just as in *RecogniCorp* and in *Digitech*, the Fallon Patents claim processes that:

(1) "start[] with data" (e.g., "at least a portion of a data block," '535 patent, Claim 15); (2) "add[]

an algorithm" (e.g., a compression algorithm supplied, not by the patent—the patent provides no

compression algorithms of its own—but by one of the routine and conventional "asymmetric compressors" in the prior art[3]); and (3) "end[] with a new form of data" (e.g., the "*one or more compressed data blocks*"). The Fallon Patents' claims thus fall squarely within the holdings of *RecogniCorp* and *Digitech* and, just like those claims, are directed to an abstract idea.[4]

Indeed, the idea of the Fallon Patents—choosing between different compression schemes based on characteristics of the data or its communication medium—is merely a mental process that can be executed in the human brain or on pen and paper. Take, for example, data consisting of today's date. If the communication medium is the (relatively space-unconstrained) signature block of a brief, one may write out "January 25, 2018," whereas a Westlaw Bluebook citation might simply note "(D. Del. Jan. 25, 2018)," while a citation to a Supreme Court case authored today might state only "(2018)," and a date field on a DMV form might reflect "01/25/18." In each case, a purely mental process is used to select among different ways of compressing the date based on either a parameter of the data (e.g., whether it represents the date of a Supreme Court opinion) or the constraints of the communication medium (e.g., the six-digit date field of a DMV form). In sum, the Fallon Patents' selection of a compression scheme based on the characteristic of data requiring compression (or the communication medium) is nothing more than an abstract idea that has been conducted mentally or on pen and paper for years before Realtime's "invention." Because the Fallon Patents fall into the category of "analyzing

---

[3]     Realtime did not invent asymmetric compression, nor do the Fallon Patents purport to provide improvements upon existing asymmetric compression schemes. Indeed, the only asymmetric compression algorithms described in the Fallon Patents are well-known asymmetric "dictionary based compression schemes such as Lempel-Ziv." D.I. 8-1 ('535 patent) at 1:31–38.

[4]     Indeed, in this respect, the Fallon Patents also are analogous to numerous other Federal Circuit cases finding abstract claims directed to (1) data gathering, (2) manipulation of that data, and (3) storing the results of that manipulation. *See, e.g.*, *Content Extraction*, 776 F.3d at 1347 (claims directed to "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" patent ineligible); *TLI*, 823 F.3d at 611 (claims directed to "classifying an image and storing the image based on its classification" ineligible).

information by steps people go through in their minds, or by mathematical algorithms, without more," there is no doubt that the Fallon Patents are abstract in nature. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016); *see also CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011).

### 5.      Step Two: The Fallon Patents Claim Only Conventional Technology

The second step of the *Alice* framework requires determining whether the claims contain an inventive concept sufficient to transform the recited abstract idea into a patent-eligible invention. In *Alice*, the Supreme Court explicitly warned that "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment" and held that, for this reason, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. Indeed, "[g]iven the ubiquity of computers . . . [a] wholly generic computer implementation is not generally the sort of 'additional feature' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself.'" *Id.* Yet, such "wholly generic" implementations are the only things—beside the abstract ideas—recited by the claims of the Fallon Patents beyond the abstract idea.

For example, the limitations of representative Claim 15 of the '535 patent contain nothing more than the abstract idea, along with routine and conventional—wholly generic—computer implementations. The first step of the claim merely calls for gathering data about a "portion of a data block"—without providing any specific means or improved technology for doing so. *See* D.I. 8-1 ('535 patent), Claim 15 ("*determining a parameter* of at least a portion of a data block"). It is well-established that "mere data-gathering steps" such as this "cannot make an otherwise nonstatutory claim statutory." *CyberSource*, 654 F.3d at 1370; *Elec. Power*, 830 F.3d at 1353 ("[W]e have treated collecting information, including when limited to particular content (which

does not change its character as information), as within the realm of abstract ideas.") (collecting

cases). That such information collection cannot confer eligibility is especially true here, where

the claims "do not even require a new source or type of information, or new techniques for

analyzing it." *Elec. Power*, 830 F.3d at 1355.

The second step of the claim—"selecting one or more asymmetric compressors . . . based

upon the determined parameter or attribute"—likewise cannot supply an "inventive step." That is

because this step claims the abstract idea *itself* and recites only wholly conventional technology

in the form of "asymmetric compressors." The patents acknowledge that asymmetric

compressors were known. *See supra* n.3. And, importantly, the actual claimed step of "*selecting*"

such a compressor may be carried out with no technology whatsoever in a human's mind. *See*

*supra* § IV.B.4. For instance, when compressing oral argument recordings for distribution via its

website, the Federal Circuit elects to use a 32kbps MPEG-3 compression scheme, which results

in a file size suitable for transmission over the Internet (roughly 15 megabytes for a one-hour

panel session), while maintaining an audio quality adequate for an oral argument. However, if

the same court personnel were instead seeking to transmit her granddaughter's 15-minute piano

recital, she might instead choose to use a higher-quality 256kbps MPEG-3 compression scheme.

The claim's third step—"compressing the at least the portion of the data block with the

selected one or more asymmetric compressors to provide one or more compressed data

blocks"—likewise involves only wholly conventional technology. As noted above, the Fallon

Patents acknowledge that asymmetric compressors were well-known, and the claim does not

purport to supply or require any new compression technology. *See TLI*, 823 F.3d at 612 ("[T]he

claims here are not directed to a specific improvement to computer functionality. Rather, they are

directed to the use of conventional or generic technology in a nascent but well-known

environment, without any claim that the invention reflects an inventive solution to any problem presented by combining the two."). Indeed, in *RecogniCorp*, the Federal Circuit held abstract claims directed to the compression of digital data because they "reflect[ed] standard encoding and decoding, an abstract concept long utilized to transmit information." 855 F.3d at 1326.

The final step—"storing at least a portion of the one or more compressed data blocks"— similarly involves no inventive concept. It is well-established that "storing" data is a wholly "generic computer function[]" that cannot confer patent eligibility. *See, e.g.*, *TLI*, 823 F.3d at 612; *Content Extraction*, 776 F.3d at 1347 ("The concept of data . . . storage is undisputedly well-known."); *Alice*, 134 S. Ct. at 2360 (noting basic storage function of generic computer).

At bottom, the claim limitations amount to nothing more than the abstract idea of selecting a compression scheme based on a characteristic of the data or its communication medium—coupled with routine data manipulation using conventional compression techniques to encode data for storage. Representative Claim 15 thus "amount[s] to 'nothing significantly more' than an instruction to apply the abstract idea . . . using some unspecified, generic computer." *Alice*, 134 S. Ct. 2360. "[T]hat is not 'enough' to transform an abstract idea into a patent eligible invention," and the claim is thus invalid under Section 101."[5] *Id.*

_____

[5]     To the extent Realtime suggests that one of several cases in the Eastern District of Texas involving *unrelated* patents asserted by its parent company, Realtime Data, LLC ("Realtime Data") compels a different result, that should be rejected. At the outset, all but one predate the controlling ruling in *RecogniCorp*, in which the Federal Circuit found similar claims directed to the compression of digital data ineligible. *See supra* § IV.B.4. The lone post-*RecogniCorp* decision denying an eligibility challenge to a Realtime Data patent applied the wrong test under recently clarified law. *See Realtime Data, LLC v. Carbonite, Inc.*, No. 6:17-cv-00121, 2017 WL 4693969, at *5–*6 (E.D. Tex. Sept. 20, 2017). There, Magistrate Judge Love relied extensively on the specification—rather than the claims—to define the alleged inventive concept. *See, e.g.*, *id.* (relying on specification for proposition that the patent "results in real-time or pseudo-real-time compression" and relying on that fact as a basis for finding the claims non-abstract). After that decision, the Federal Circuit clarified that this specification-driven analysis is improper, finding an alleged invention patent-ineligible where "the claim—as opposed to something purportedly described in the specification—is missing an inventive concept." *Two-Way Media*

### 6.     None Of The Minor Variations On The Abstract Idea Found In Other Claims Alter The Analysis

None of the other claims of the Fallon Patents have any impact on the analysis. Indeed, the remaining claims are directed to the same abstract idea of selecting a compression scheme based on a characteristic of data or its communication medium, with immaterial differences only.

For example, certain other claims of the '535 patent call for the use of one or more "central processing units" (*see, e.g.*, D.I. 8-1 ('535 patent) at Claims 18 and 30), but it is axiomatic that such general-purpose computers cannot confer eligibility. *Alice*, 134 S. Ct. at 2357. Other claims, such as Claim 17, call for "retrieving" and "transmitting" the compressed data—but "retrieval" and "transmission," too, are generic capabilities of computers insufficient to confer eligibility. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340–41 (Fed. Cir. 2017) (describing collection of data as a basic function of a computer and finding claims abstract); *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 714 (D. Del. 2012) (claims directed to organizing, storing, and transmitting data abstract); *buySAFE*, 765 F.3d 1355 ("That a computer receives *and sends the information* over a network—with no further specification—is not even arguably inventive."). Still other claims, e.g., Claim 27, purport to limit the *type* of data at issue to "audio or video data." But such limitations on the *type* of data processed by the claim merely limit the claim to a "particular technological environment," which does not render it patentable. *See Alice*, 134 S. Ct. at 2358 ("the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment"); *RecogniCorp*, 855 F.3d at 1328 (finding abstract claims "directed to encoding and decoding *image* data").

---

*Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338–39 (Fed. Cir. 2017). In any event, the Report and Recommendation in *Carbonite*—which has yet to be adopted by a district court—is non-binding, unlike the Federal Circuit's decisions in *RecogniCorp* and *Two-Way*.

The '477 patent's claims fare no better. For instance, although some of its claims call for selecting a compression scheme based, not on characteristics of the data itself, but instead based on "the throughput of a communications channel" (e.g., '477 patent, Claim 1), this difference in the *source* of information does not change the fact that this merely represents a data-collection step using conventional technology—and thus cannot confer patent eligibility.[6] And while other claims recite "the Internet" (e.g., Claim 14) and "a memory" (e.g., Claim 19), those too are routine and conventional elements insufficient to confer eligibility. *See Ultramercial*, 772 F.3d at 715. In short, just like those of the '535 patent, the '477 patent claims are invalid because they are directed to an abstract idea, and the remaining claim elements merely implement this abstract idea using routine and conventional computing elements insufficient to confer patent eligibility.

The '442 patent's claims largely mirror those of the '535 and '477 patents, except that they include the additional component of a "data decompression system configured to decompress a compressed data block." *See, e.g.*, '442 patent, Claim 8. However, the generic "decompression" claimed by the '442 patent is nothing more than the mirror image of the generic "compression" step of the '535 patent—it involves decoding the data encoded by the compressor—and thus is likewise insufficient to confer patent eligibility. *See RecogniCorp*, 855 F.3d at 1328 (finding abstract claims "directed to encoding and *decoding* image data").

The claims of the '907 patent are similarly abstract. Claim 1—its sole independent claim—is substantially similar to the '477 patent, but further recites that one of two compression routines compresses at a higher data rate. *See* D.I. 8-4 ('907 patent), Claim 1. As with the foregoing patents, the '907 patent does not purport to provide any specific compression routines or improvements upon existing compression technology. As such, the recitation of a (generic)

---

[6]     Nowhere does the '477 patent purport to provide new or particularized means for determining the throughput of a communications channel.

routine that compresses at a "higher rate" merely represents a limitation on the use of the abstract idea to a "particularly technological environment," which cannot save the claim. *Alice*, 134 S. Ct. at 2358. Other claims of the '907 patent attempt to limit the type of compression algorithm used (e.g., Claims 3–4, 7–9), the parameter (e.g., Claims 6, 14), the data itself (e.g., Claim 5), or the communications channel used (e.g., Claims 10–11). Such variations do not alter the fact that the claims merely implement the abstract idea using (various combinations) of generic computing technology, limited to "particular technological environments," which cannot confer eligibility.

The final Fallon Patent—the '046 patent—is no different. The only structural elements mentioned in any of the claims is a "controller" that generates a "control signal." D.I. 8-5 ('046 patent), Claim 40. A "controller," however, also is a generic computing component, and courts in this District have long held that "the inclusion of a *control signal* [cannot] make [a] claim patent eligible." *Personalized Media Commc'ns, LLC v. Amazon.Com, Inc.*, 161 F. Supp. 3d 325, 332 (D. Del. 2015), *aff'd sub nom.*, 671 F. App'x 777 (Fed. Cir. 2016). As such, the '046 patent contains no inventive concept "sufficient to ensure that the patent in practice amounts to *significantly more* than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355.

## V.     CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed in its entirety.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

OF COUNSEL:

Sonali D. Maitra
Timothy C. Saulsbury
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666

January 26, 2018

Jack B. Blumenfeld (#1014)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com

*Attorneys for Defendants*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 26, 2018, upon the following in the manner indicated:

Stephen B. Brauerman, Esquire                                   *VIA ELECTRONIC MAIL*
Sara E. Bussiere, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE 19801
*Attorneys for Plaintiff*

Mark A. Fenster, Esquire                                        *VIA ELECTRONIC MAIL*
Reza Mirzaie, Esquire
Brian D. Ledahl, Esquire
C. Jay Chung, Esquire
Philip X. Wang, Esquire
Timothy T. Hsieh, Esquire
RUSS, AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025-1031
*Attorneys for Plaintiff*

/s/ *Jack B. Blumenfeld*
_____
Jack B. Blumenfeld (#1014)